# EXHIBIT D

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **TONYA ST. JOHN** | ) | |
| | ) | |
| **Complainant,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2025-CAB-007879** |
| | ) | |
| **The Midtown Group/** | ) | |
| **RATP DEV D.C.** | ) | |
| **And** | ) | |
| **Lisa Porter, HR Manager** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ______________________________ | ) | |

**MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

**COMES NOW** Plaintiff Tonya St. John, by and through undersigned counsel, and respectfully moves this Honorable Court, pursuant to Super. Ct. Civ. R. 15(a)(3), for leave to file a Second Amended Complaint. Defendant consents to this motion. In support thereof, Plaintiff states as follows:

## I. INTRODUCTION

This motion seeks leave to file a Second Amended Complaint to clarify and refine Plaintiff's claims, to add related claims arising from the same nucleus of operative facts, and to ensure that the pleadings accurately reflect the full scope of relief available under applicable federal and District of Columbia law. The proposed Second Amended Complaint also streamlines and consolidates factual allegations to improve clarity and readability, without expanding the factual scope of the case.

The proposed amendments do not introduce new factual allegations requiring additional discovery and do not prejudice Defendants, who have not yet filed a responsive pleading and

remain within the initial period to respond to the operative complaint. Accordingly, the proposed amendment will not delay the proceedings. Rather, it serves the interests of justice by allowing this case to proceed on a complete, accurate, and properly framed set of claims.

## II. LEGAL STANDARD

Under Super. Ct. Civ. R. 15(a)(3), leave to amend "shall be freely given when justice so requires." The District of Columbia courts apply Rule 15(a) liberally and favor amendment absent a showing of: undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of amendment. *See*, *e.g.*, *Miller-McGee v. Washington Hosp. Center*, 920 A.2d430 (2007). None of those factors is present here.

## III. THE PROPOSED AMENDMENTS

Plaintiff seeks leave to amend the Complaint to:

1. Consolidate and clarify the factual allegations to present a more concise statement of the same underlying conduct, without introducing new facts requiring additional discovery;
2. Clarify and tighten existing claims under the Americans with Disabilities Act to ensure they are pled with precision and in conformity with governing pleading standards;
3. Add claims under the District of Columbia Human Rights Act, including disability discrimination, failure to accommodate, retaliation, hostile work environment, and aiding and abetting, all based on the same facts already alleged;
4. Clarify the roles and liability of individual defendants, consistent with District of Columbia law permitting individual liability under the DCHRA;
5. Conform the Prayer for Relief to reflect all available legal and equitable remedies under federal and District of Columbia law.

The Second Amended complaint is attached hereto as Exhibit 1 if this motion is granted by this honorable court.

## IV. NO UNDUE DELAY, BAD FAITH, OR PREJUDICE

Plaintiff brings this motion promptly after reviewing the pleadings and applicable law and before any dispositive rulings on the merits. Defendants will not be prejudiced by the proposed amendment because: the amendments are based on facts already known to Defendants; no new discovery burdens are imposed; no trial date will be impacted; and Defendants retain full opportunity to respond to the amended claims. There is no bad faith or dilatory motive. The proposed amendments are made to ensure the case proceeds efficiently and on its merits.

## V. THE AMENDMENT IS NOT FUTILE

The proposed Second Amended Complaint states plausible claims for relief under both the ADA and the DCHRA and is supported by detailed factual allegations. Courts routinely permit amendment where, as here, the plaintiff seeks to add related statutory claims based on the same factual allegations. Any argument regarding the ultimate merits of those claims is properly addressed at a later stage of the proceedings.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff leave to file a Second Amended Complaint.

January 15, 2026

Respectfully Submitted,

By:/s/ Sandra A. Maddox

SANDRA A. MADDOX
20 F. St. NW, Ste. 700
Washington, D.C. 20001
Phone No.: 202-412-4787
sandra.maddox@themaddoxlawoffice.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on January 15, 2026, a copy of the foregoing Motion For Leave to File Second Amended Complaint was filed and served via eFileDC and email to counsel of record.

/s/Sandra A. Maddox
SANDRA A. MADDOX
Attorney for Plaintiff

Mathew Clark
mclark@constangy.com

Attachment 1

Second Amended Complaint

Attachment 1

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TONYA ST. JOHN**<br>**138 Ivanhoe St., SW**<br>**Apt. 201**<br>**Washington, D.C. 20032**<br>**(202) 569-1444** | ) |
| **Complainant,** | ) |
| **v.** | ) **Civil Action No. 2025-CAB-007879** |
| **The Midtown Group/**<br>**RATP DEV D.C.**<br>**And**<br>**Lisa Porter, HR Manager** | ) |
| **Debra Martinez,**<br>**Registered Agent**<br>**3800 Sandshell Drive**<br>**Suite 180**<br>**Fort Worth, Texas 76137** | ) |
| **And** | ) |
| **300 Throckmorton Street**<br>**Suite 670**<br>**Fort Worth, TX 76102** | ) |
| **Defendants.** | ) |

**SECOND AMENDED COMPLAINT**

**COMES NOW** Plaintiff, Tonya St. John, (hereinafter "Ms. St. John" or "Plaintiff"), and files this complaint against The Midtown Group/RATP DEV D.C. Streetcar (hereinafter "RATP",

"Defendant" or "Employer Defendant") and Lisa Porter, (hereinafter "Defendant" or "Ms. Porter"), Human Resources ("HR") Manager and as for causes of action states as follows:

## NATURE OF CASE

1. This is an employment discrimination action arising from Defendants' failure to provide a reasonable accommodation to a qualified employee with a documented respiratory disability, and from retaliation and harassment following Plaintiff's protected activity. Plaintiff brings claims under Title I of the Americans with Disabilities Act ("ADA") and the District of Columbia Human Rights Act ("DCHRA").

2. Plaintiff alleges that Defendant RATP DEV D.C. Streetcar/The Midtown Group, acting as Plaintiff's employer, refused to provide or implement an effective accommodation despite medical documentation, failed to engage in a good-faith interactive process, and subjected Plaintiff to escalating adverse treatment, including repeated confrontations and public humiliation, that interfered with Plaintiff's access to her workplace.

3. Plaintiff further alleges that Defendants' conduct created a hostile work environment based on disability and caused physical injury, emotional distress, lost wages, and other damages.

4. Plaintiff's ADA claims are asserted against the employer Defendant(s) only. Plaintiff's DCHRA claims are asserted against all Defendants, including Defendant Lisa Porter.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under D.C. Code § 11-921 and has jurisdiction over Plaintiff's claims under the ADA, 42 U.S.C. §§ 12111–12117, and the D.C. Human Rights Act, D.C. Code § 2-1402.11.

6. Plaintiff timely exhausted her administrative remedies under Title I of the ADA by filing an EEOC Charge on or about October 30, 2024.

7. The EEOC issued a Determination and Notice of Rights on or about September 3, 2025, and Plaintiff filed this action on December 1, 2025, within ninety (90) days of her receipt of that Notice.

8. Venue is appropriate because all of the unlawful actions complained of herein took place within the District of Columbia.

## PARTIES

9. Plaintiff, Tonya St. John, is an individual who is and has been a resident of the District of Columbia, and she formerly worked as a Bus Operator at the Midtown Group/RATP DEV's D.C. Streetcar's 17th Street location.

10. Defendant RATP is a transportation business with over 50 years of experience managing and operating transit systems throughout the United States. During the time at issue, Defendant operated within Washington, D.C., and at all relevant times, Defendant exercised control over Plaintiff's terms and conditions of employment, including human resources functions, workplace policies, supervision, and discipline, and acted as Plaintiff's employer and/or joint employer together with RATP DEV D.C. Streetcar.

11. Defendant, Lisa Porter at all relevant times herein, served as an HR Manager at RATP. At all relevant times, Defendant Porter acted within the scope of her employment and with actual or apparent authority as Human Resources Manager, and her actions and omissions are attributable to the Employer Defendants under principles of agency and respondeat superior to the extent permitted by law.

## FACTS

Ms. St. John is a person with a disability

12. Ms. St. John has long-standing respiratory disabilities, including asthma, sleep apnea, and Chronic Obstructive Pulmonary Disease ("COPD").

13. COPD is a term for certain types of irreversible lung and airway damage that block a person's airways and make it hard to breathe.

14. Ms. St. John's disability has affected her major life activities including, but not limited to, breathing, sleeping, walking, running, climbing stairs doing morning routines like getting dressed and bathing, and completing household chores such as cleaning and shopping; it also affects her emotional well-being and has contributed to anxiety.

15. Some of the major functions of Ms. St. John's job included: driving the bus; picking up passengers to and from locations; reporting to the 17th Street site daily to pick up worksheets and daily routes; and after COVID, cleaning the bus driver's sitting area before and after her use to disinfect it.

16. Ms. St. John was qualified to do her job with or without a reasonable accommodation, but her disability made walking extended distances – particularly while carrying work supplies - difficult and medically risky.

17. Ms. St. John, through her doctor, requested to be able to have a designated disability parking spot in the lot close to the door of the 17th St. building, at which she reported daily.

18. This accommodation would have allowed her to be able to report timely to work and have a very short distance to walk from her vehicle to the door of the building with her belongings in hand.

19. Without a reasonable accommodation, requiring Ms. St. John to walk extended distances while carrying work-related supplies predictably caused respiratory distress, shortness of breath, and wheezing, increased her risk of asthma and COPD exacerbations, and forced her to stop, rest, or delay entry to the building to recover her breathing; additionally, because parking remained first-come, first-served, she was frequently unable to access a space upon arrival and was unable to report to work timely on a regular basis despite arriving on time.

Background

20. As stated, during the time at issue, Ms. St. John worked as a Bus Operator at RATP DEV's DC Streetcar's 17th St. location.

21. Ms. St. John was a union member, and her employment was subject to a collective bargaining agreement ("CBA").

22. Ms. St. John was ranked 5th in seniority at RAPT. (See Attachment 1, RAPT Seniority List which Ms. St. John asserts is applicable across all employee benefits.)

23. The four people ranked above her did not work the same shift that she did. This meant that if having a parking space was based on seniority within the CBA, she should have had first priority to park on the lot during her shift. (Notably, Defendant never raised the CBA to Ms. St. John as being an issue with regard to her parking accommodation request until her complaint at the EEOC).

24. The CBA mandated that RATP provide three (3) parking spaces for bargaining-unit employees that could be used on a first-come, first-served basis.

25. In addition to the three (3) designated parking spots, there are two (2) disability parking spots. (Attachment 2 - picture of lot)

26. The parking lot has limited spaces, so, nearly all employees parked on the street.

27. Prior to 2020, all Operators could park on the lot. Ms. St. John was able to find reliable parking close to the building door or on the side of the gate, which was a short distance for her to walk and did not put her at risk of asthma attacks.

28. Upon her return to work on November 13, 2023, Plaintiff learned that the parking policy had changed and that bus operators were required to park outside the gate due to limited on-site spaces, requiring her to walk a distance approximately three times longer than before; as she walked into the building that day, it became apparent that this increased distance would be difficult and detrimental to her health given her respiratory disability.

29. When she had a break from training that she was attending, she went to Defendant Lisa Porter, HR Manager, to request a reasonable accommodation to park in the lot in a dedicated disability space closer to the building.

30. Defendant Lisa Porter, the HR Manager, denied the request, stating that all parking spaces—including disability spaces—were first-come, first-served.

31. Ms. St. John provided Ms. Porter with her disability placard, giving Defendants actual notice of her disability and limitations.

32. Ms. Porter told Plaintiff she could park along the back fence, but only on a first-come, first-served basis, which did not reduce the walking distance or mitigate Plaintiff's symptoms.

33. Ms. Porter assured Ms. St. John she would notify management and security of this permission but failed to do so.

34. Subsequently, when Ms. St. John tried to implement the ineffective accommodation, she was repeatedly confronted by security and supervisors who challenged her presence in the lot, stating they had received no authorization permitting her to park there.

35. On November 14, 2023, Ms. St. John was in training at the 17th St. building and she parked in the lot along the back fence.

36. She went to her vehicle on a break and a written notice was conspicuously posted on her vehicle stating the space was "reserved until further notice. Feel free to see management if you have any questions...."

37. Believing that Ms. Porter had discretely made the proper arrangements that she promised for her, Ms. St. John was publicly singled out and embarrassed by the sign being plastered on her vehicle for all to see and believe that she was breaking a rule.

38. November 28, 2023, while Ms. St. John was pulling into the parking lot to report to work, Security came out of the booth and told her she could not park in the lot even along the back lot fence.

39. Ms. St. John asked him to talk to Ms. Porter whom she believed had made the proper accommodation arrangements to allow Ms. St. John to park in the lot.

40. The Security Guard stated that he did not get a memo or any notification from Ms. Porter giving Ms. St. John permission to park anywhere inside the lot.

41. Ms. St. John saw a disability space in which to park, but the company vehicle, (with no disability sign in it), was already parked in the space. (Attachment 3)

42. The space in which Ms. Porter told Ms. St. John she could park along the fence in the back of the lot was taken as well.

43. Plaintiff was repeatedly forced to wait for a parking space to become available, causing her to be late for work on multiple occasions.

44. December 15, 2023, when Ms. St. John reported to work all spaces at the back of the fence were taken and no disability space was available.

45. Ms. St. John was again confronted by security after parking with supervisory permission, requiring her to explain her disability and accommodation needs publicly again.

46. Plaintiff reported the ongoing problems and ineffectiveness of the accommodation to Ms. Porter and other managers, including the Assistant General Manager, (who gave her the permission to park in the lot on December 15, 2023).

47. Despite being informed that the accommodation was ineffective and that Plaintiff was being repeatedly confronted and harassed, management—including Ms. Porter—failed to take corrective action, allowing the situation to persist and escalate.

48. On another occasion, Supervisor Butler saw Ms. St. John sitting in her car waiting for a space on the lot to become available and questioned her about her presence in the lot; he told her the other Operators wanted to know why she was allowed to park there, forcing Ms. St. John to repeatedly justify her disability related parking need.

49. On January 5, 2024, Ms. St. John again went to Ms. Porter and provided her physician's note requesting disability parking to prevent shortness of breath and respiratory distress. It states in part:

> … Ms. St. John is being seen in my pulmonary clinic for a history of severe persistent asthma and bronchiectasis. She's able to work as tolerated without restrictions. Please allow her to park her transit vehicle in disability parking as in line with her disability paperwork to prevent instances of shortness of breath in association with ADA guidelines…. (Attachment 4)

50. In response, Ms. Porter again offered only first-come, first-served parking at the rear of the building, requiring Plaintiff to arrive early and wait in her vehicle for a space.

51. Treating first-come, first-served parking as Plaintiff's accommodation—while repeatedly subjecting her to questioning by supervisors and security, allowing coworkers to comment on her presence in the lot, and forcing her to repeatedly justify her disability-related parking need—constituted unwelcome, hostile treatment that occurred daily and became pervasive.

52. Plaintiff sought medical and therapeutic care due to escalating anxiety, emotional distress, and worsening respiratory symptoms caused by the lack of an effective accommodation and the resulting harassment.

53. Plaintiff went on leave from approximately January 23, 2024 through April 21, 2024.

54. On or about April 22, 2024, while pulling into the parking lot at 5:50 a.m. Mr. Lewis, Safety Supervisor, watched Ms. St. John trying to find a parking space, walked over to her truck, and questioned why she was there.

55. After Ms. St. John explained to him why she was in the lot, Mr. Lewis abruptly and aggressively confronted her saying all the disability parking was taken and that she had to park outside of the gate.

56. She told him that she had an accommodation to park on the lot. His tone escalated as he began yelling at her insisting that she had no permission to park in the lot.

57. Still yelling, Mr. Lewis told Ms. St. John that he didn't receive any notification permitting her to park in the lot, so she could not park in any parking space in the lot.

58. Ms. St. John told him to take it up with Ms. Porter, and she got out of her car and started walking to the building.

59. Mr. Lewis followed Ms. St. john into the building while continuing to berate her.

60. Ms. St. John entered the building experiencing shortness of breath and visible emotional distress following the confrontation and as a result of the ongoing harassment stemming from Defendants' refusal to implement an effective accommodation.

61. The same day of the confrontation with Mr. Lewis, Ms. St. John spoke to Ms. Hedgepath, Operations Manager, about her encounter with Mr. Lewis, and Ms. Hedgepath told Ms. St. John to write up the incident, which Ms. St. John did.

62. Ms. Porter dismissed the complaint, declined to investigate, and took no remedial action despite Ms. St. John asking her to look at the video footage that would have been recorded by security cameras.

63. In May 2024, as the harassment continued, Ms. St. John continued to complain to Ms. Porter about the lack of an effective accommodation, the repeated confrontations, and the failure to notify security and management.

64. This time when Ms. St. John came to complain and ask for help, Ms. Porter hid behind her office door from Ms. St. John; she refused to engage in the interactive process or address the harassment.

65. As a result of Defendants' failure to provide an effective accommodation, Plaintiff was subjected to repeated questioning, confrontations, and yelling by management regarding her presence in the parking lot, conduct that could have been avoided through a designated disability parking accommodation and that became severe, pervasive, and unchecked.

66. Ms. St. John required ongoing therapy and medical treatment due to anxiety, emotional distress, and worsening respiratory symptoms.

67. Plaintiff's medications were adjusted, her respiratory symptoms worsened, and she lost pay and benefits due to missed work caused by Defendants' unlawful conduct.

## CLAIM I
## Failure to Accommodate in violation of Title I of the ADA, as amended 42 U.S.C. §§12111-12117

68. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

69. Ms. St. John has a documented disability, including, but not limited to asthma, bronchiectasis, and COPD that severely affects her respiratory system.

70. Employer Defendant had notice of her disability when she requested a reasonable accommodation, provided a disability parking placard, and submitted her doctor's reasonable accommodation request to be able to park in the disability parking spot in the parking lot of the building at which she reports to work.

71. Employer Defendant, through Ms. Porter, denied Plaintiff’s request, stating that all parking—including disability spaces—was first-come, first-served.

72. Ms. Porter offered Plaintiff the ability to park along the back fence or behind the building on a first-come, first-served basis, neither of which provided access to a designated disability parking space or meaningfully reduced the walking distance required, rendering the purported accommodation ineffective.

73. Employer Defendant failed to communicate any accommodation to management or security, resulting in repeated challenges to Plaintiff’s ability to park, also rendering the purported accommodation ineffective.

74. Employer Defendant continued to allow non-disabled employees and company vehicles without disability placards to occupy disability parking spaces during Plaintiff’s shift.

75. Reasonable accommodations were available, including assigning Plaintiff a designated disability parking space or issuing a parking permit and notifying management and security, none of which would have imposed an undue hardship.

76. Despite Plaintiff's repeated reports that the accommodation was ineffective and medically harmful, Employer Defendant refused to modify the accommodation or engage in a good-faith interactive process.

77. Treating first-come, first-served parking as Plaintiff's accommodation did not enable her to access the workplace safely or timely and thereby perform the essential functions of her job, and it did not constitute a reasonable accommodation under the ADA.

78. As a result of Employer Defendant's failure to effectively accommodate, Plaintiff experienced foreseeable respiratory distress, exacerbation of her asthma and COPD, and repeated delays or inability to report to work timely despite arriving on time.

79. Employer Defendant's refusal to provide an effective accommodation and failure to engage in the interactive process violated Title I of the ADA.

80. Plaintiff suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages as a direct and proximate result of Employer Defendant's unlawful conduct.

**CLAIM II**
**Retaliation**
**In Violation of Title I of the ADA**
**42 U.S.C. § 12203**
(Against Employer Defendants Only)

81. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

82. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation, submitting medical documentation, complaining repeatedly about ineffective accommodation, and reporting disability-based harassment.

83. Employer Defendants had actual knowledge of Plaintiff's protected activity.

84. Following Plaintiff's protected activity, Employer Defendants subjected Plaintiff to materially adverse actions, including refusing to provide an effective accommodation, escalating confrontations and repeated challenges to Plaintiff's right to park pursuant to her accommodation, permitting repeated harassment by management and security, ignoring and/or not effectively addressing formal complaints, and creating conditions that would dissuade a reasonable employee from engaging in protected activity.

85. Employer Defendants' retaliatory actions were not isolated or accidental but escalated after Plaintiff's repeated complaints and medical submissions.

86. After Plaintiff complained and submitted medical documentation, Employer Defendants continued and escalated their responses through repeated confrontations and public humiliation, including the posted notice on her vehicle and aggressive challenges by supervisors and security, conduct that would deter a reasonable employee from requesting accommodation or complaining about discrimination.

87. There is a causal connection between Plaintiff's protected activity and Employer Defendants' adverse actions.

88. Employer Defendants' conduct violated the ADA's anti-retaliation provisions.

**CLAIM III**
**Hostile Work Environment Based on Disability**
**In Violation of Title I of the ADA**
(Against Employer Defendants Only)

89. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

90. Plaintiff is a qualified individual with a disability within the meaning of the ADA.

91. Plaintiff was subjected to unwelcome conduct in the workplace that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

92. The harassment was severe and pervasive in that it included repeated and aggressive confrontations by supervisors and security, public singling out and humiliation, interference with Plaintiff's access to the workplace, and the requirement that Plaintiff repeatedly justify her disability-related parking need, conduct that occurred on a near-daily basis and foreseeably caused physical respiratory distress and emotional harm.

93. The hostile conduct was disability-based because it arose directly from Employer Defendants' knowledge of Plaintiff's disability, their denial of her requested accommodation, and their failure to implement or communicate any effective accommodation, which foreseeably exposed Plaintiff to repeated confrontation, scrutiny, and humiliation in accessing her workplace.

94. Employer Defendants knew or should have known of the disability-based harassment because Plaintiff repeatedly reported the conduct to Human Resources and management, submitted a written complaint following a confrontational incident involving a supervisor, requested review of available camera footage, and the harassment was carried out openly and repeatedly by supervisors and security personnel in employer-controlled spaces; despite this knowledge, Employer Defendants failed to take prompt or effective remedial action.

95. Because of Employer Defendants' failure to intervene, correct the conduct, or implement an effective accommodation Plaintiff's work conditions were materially altered, and she was subjected to a hostile and abusive work environment that interfered with her ability to perform her job on equal terms with non-disabled employees.

96. As a result of Employer Defendants' actions and omissions, Plaintiff was subjected to an abusive and hostile working environment in violation of the ADA.

**CLAIM IV**
**Disability Discrimination and Failure to Provide Reasonable Accommodation**
**In Violation of the District of Columbia Human Rights Act**
**D.C. Code § 2-1402.11(a)**
(Against All Defendants)

97. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

98. Plaintiff is a person with a disability within the meaning of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(5A), including but not limited to asthma, bronchiectasis, COPD, sleep apnea, and anxiety, which substantially limit major life activities including breathing, walking, sleeping, lifting, and working.

99. At all relevant times, RATP was an employer within the meaning of the DCHRA.

100. Defendants had actual knowledge of Plaintiff's disability and resulting limitations through Plaintiff's repeated disclosures, submission of a disability parking placard, and submission of a physician's written accommodation request.

101. Plaintiff requested a reasonable accommodation in the form of permission to park in a designated disability parking space near the workplace entrance in order to safely access her job site.

102. The requested accommodation was reasonable, available, and would not have imposed an undue hardship on Defendants.

103. Despite notice, Defendants failed and refused to provide Plaintiff with an effective accommodation and instead subjected Plaintiff to the same first-come, first-served parking policy as non-disabled employees, rendering the purported accommodation ineffective.

104. Defendants further failed to engage in a good-faith interactive process to identify or implement a reasonable accommodation, despite Plaintiff's repeated reports that the accommodation was not working and was endangering her health.

105. Defendants' refusal to provide an effective accommodation denied Plaintiff equal access to her workplace and materially altered the terms and conditions of her employment, including delays in reporting to work, lost wages, and medical harm caused by respiratory exacerbations.

106. Defendants' conduct constituted unlawful disability discrimination and failure to accommodate in violation of the DCHRA.

107. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered physical injury, emotional distress, lost wages and benefits, medical expenses, and other compensable damages.

**CLAIM V**
**Retaliation**
**In Violation of the District of Columbia Human Rights Act**
**D.C. Code § 2-1402.61**
(Against All Defendants)

108. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

109. Plaintiff engaged in protected activity under the DCHRA by requesting reasonable accommodation, submitting medical documentation, complaining repeatedly about ineffective accommodation, and reporting disability-based harassment by management and security personnel.

110. Defendants were aware of Plaintiff's protected activity.

111. Because of Plaintiff's protected activity, and in response to her requests for accommodation and complaints of disability-based harassment, Defendants subjected Plaintiff to materially adverse actions, including but not limited to: refusing to implement or communicate an effective accommodation; repeatedly permitting security and supervisors to confront Plaintiff in the parking lot and challenge her right to park; publicly singling Plaintiff out by posting a notice on her vehicle implying she was improperly parked; requiring Plaintiff to repeatedly explain and justify her disability-related parking request to multiple managers and security personnel; ignoring Plaintiff's written complaint regarding hostile and aggressive treatment; and otherwise allowing the harassment to continue unchecked—conduct that would deter a reasonable employee from requesting accommodation or complaining about discrimination.

112. Defendants' adverse actions were causally connected to Plaintiff's protected activity and were undertaken in retaliation for Plaintiff's complaints and accommodation requests.

113. Defendants' retaliatory conduct was intentional, willful, and in reckless disregard of Plaintiff's rights under the DCHRA.

114. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered lost wages, emotional distress, physical harm, and other damages.

**CLAIM VI**
**Hostile Work Environment Based on Disability**
**In Violation of the District of Columbia Human Rights Act**
(Against All Defendants)

115. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

116. Plaintiff was subjected to repeated, unwelcome conduct by Defendants because of her disability and her requests for accommodation.

117. The harassment included, among other things: repeated confrontations by security and supervisors; being publicly accused of improper parking; a written notice placed conspicuously on her vehicle; being followed into the building while being yelled at; being required to repeatedly disclose her disability to justify her presence; and management's refusal to intervene or correct the conduct.

118. After Plaintiff complained and submitted medical documentation, Defendants' responses escalated from denial to repeated confrontations and public humiliation, including the posted notice on her vehicle and aggressive challenges by supervisors and security.

119. Although individual supervisors and security personnel may not have known the specific medical diagnosis underlying Plaintiff's accommodation request, the hostile work environment Plaintiff experienced was disability-based because Employer Defendants knew Plaintiff had a disability, denied her requested accommodation despite knowing she needed it because of her disability, failed to communicate or implement any effective accommodation, and thereby created conditions that predictably caused supervisors and security to repeatedly confront, single out, and publicly humiliate Plaintiff.

120. The resulting harassment was not incidental or independent conduct but flowed directly from Employer Defendants' refusal to authorize or communicate a disability-related accommodation, despite knowledge that such failure would foreseeably expose Plaintiff to repeated confrontation, scrutiny, and humiliation in the workplace.

121. The harassment was severe and pervasive, occurred over many months, involved multiple supervisory employees, and was humiliating, intimidating, and physically harmful given Plaintiff's known respiratory condition.

122. Defendants knew or should have known of the harassment and failed to take prompt and effective remedial action.

123. As a result of Defendants' conduct, Plaintiff was subjected to a hostile, abusive, and intimidating work environment that altered the conditions of her employment and interfered with her ability to perform her job safely and on equal terms with non-disabled employees.

124. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered substantial emotional distress, physical injury, lost wages, and other compensable damages.

**CLAIM VII**
**Aiding and Abetting Discrimination and Retaliation**
**D.C. Code § 2-1402.62**
(Against Defendant Lisa Porter)

125. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

126. Defendant Lisa Porter knowingly aided, abetted, incited, compelled, and coerced the unlawful discriminatory and retaliatory conduct described herein.

127. Ms. Porter personally denied Plaintiff's accommodation requests, failed to communicate approved accommodations, ignored written complaints, refused to engage in the interactive process, and actively avoided Plaintiff when further complaints were made.

128. Ms. Porter's conduct was intentional and materially contributed to the discrimination, retaliation, and hostile work environment suffered by Plaintiff.

129. Ms. Porter is individually liable under the DCHRA for aiding and abetting unlawful employment practices.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants The Midtown Group/RATP DEV D.C. Streetcar and Lisa Porter, jointly and severally, and prays that this Honorable Court:

a. Award equitable relief for all harm Plaintiff has sustained as a result of Defendants' unlawful conduct, including for loss of promotional potential, reputation, lost wages, and lost job benefits;

b. Award compensatory damages;

c. Punitive damages under the District of Columbia Human Rights Act against Defendants, including Defendant Lisa Porter where applicable;

d. Award medical costs and expenses incurred as a result of Defendants' unlawful conduct;

e. Award-lost wages and back pay with interest;

f. Award reasonable attorneys fees, cost, and expenses incurred for this action;

g. Award equitable relief, declaratory, and injunctive relief;

h. An award of prejudgment and post judgment interest as permitted by law; and

i. Award such other and further relief as this Honorable Court deems just and proper.

January 15, 2026

Respectfully Submitted,

By:/s/ Sandra A. Maddox
SANDRA A. MADDOX
20 F. St. NW, Ste. 700
Washington, D.C. 20001
Phone No.: 202-412-4787
sandra.maddox@themaddoxlawoffice.com
*Counsel for Plaintiff*

# Attachment 2

# [REDLINED] Second Amended Complaint

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| **TONYA ST. JOHN**<br>**138 Ivanhoe St., SW**<br>**Apt. 201**<br>**Washington, D.C. 20032**<br>**(202) 569-1444**<br><br>**Complainant,** | ) |
| **v.** | ) Civil Action No. **2025-CAB-007879** |
| **The Midtown Group/**<br>**RATP DEV D.C.**<br>**And**<br>**Lisa Porter, HR Manager**<br><br>**Debra Martinez,**<br>**Registered Agent**<br>**3800 Sandshell Drive**<br>**Suite 180**<br>**Fort Worth, Texas 76137**<br><br>**And**<br><br>**300 Throckmorton Street**<br>**Suite 670**<br>**Fort Worth, TX 76102**<br><br>**Defendants.** | ) |

## SECOND AMENDED COMPLAINT

**COMES NOW** Plaintiff, Tonya St. John, (hereinafter "Ms. St. John" or "Plaintiff"), and files this complaint against The Midtown Group/RATP DEV D.C. Streetcar (hereinafter "RATP",

"Defendant" or "Employer Defendant") and Lisa Porter, Human Resources ("HR") Manager, and as for causes of action states as follows:

## NATURE OF CASE

1. This is an employment discrimination action arising from Defendants' failure to provide a reasonable accommodation to a qualified employee with a documented respiratory disability, and from retaliation and harassment following Plaintiff's protected activity. Plaintiff brings claims under Title I of the Americans with Disabilities Act ("ADA") and the District of Columbia Human Rights Act ("DCHRA").

2. Plaintiff alleges that Defendant RATP DEV D.C. Streetcar and/or The Midtown Group, acting as Plaintiff's employer and/or joint employer, refused to provide or implement an effective accommodation despite medical documentation, failed to engage in a good-faith interactive process, and subjected Plaintiff to escalating adverse treatment, including repeated confrontations and public humiliation, that interfered with Plaintiff's access to her workplace.

3. Plaintiff further alleges that Defendants' conduct created a hostile work environment based on disability and caused physical injury, emotional distress, lost wages, and other damages.

4.

Plaintiff's ADA claims are asserted against the employer Defendant(s) only. Plaintiff's DCHRA claims are asserted against all Defendants, including Defendant Lisa Porter.

~~Plaintiff's ADA claims are asserted against the employer Defendant(s) only. Plaintiff's DCHRA claims are asserted against all Defendants, including Defendant Lisa Porter, who is sued individually for aiding and abetting discrimination and retaliation.~~

## JURISDICTION AND VENUE

5.

This Court has subject-matter jurisdiction under D.C. Code § 11-921 and has jurisdiction over Plaintiff's claims under the ADA, 42 U.S.C. §§ 12111–12117, and the D.C. Human Rights Act, D.C. Code § 2-1402.11.

~~This Court has subject-matter jurisdiction over this action pursuant to D.C. Code § 11-921, as amended, and has concurrent jurisdiction over Plaintiff's federal claims under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111–12117, as well as jurisdiction over Plaintiff's claims under the District of Columbia Human Rights Act.~~

6. Plaintiff timely exhausted her administrative remedies under Title I of the ADA by filing an EEOC Charge on or about October 30, 2024.

7. The EEOC issued a Determination and Notice of Rights on or about September 3, 2025, and Plaintiff filed this action on December 1, 2025, within ninety (90) days of her receipt of that Notice.

8. Venue is appropriate because all of the unlawful actions complained of herein took place within the District of Columbia.

## PARTIES

9. Plaintiff, Tonya St. John, is an individual who is and has been a resident of the District of Columbia, and she formerly worked as a Bus Operator at the Midtown Group/RATP DEV's D.C. Streetcar's 17th Street location.

10. Defendant RATP is a transportation business with over 50 years of experience managing and operating transit systems throughout the United States. During the time at issue, Defendant operated within Washington, D.C., and at all relevant times, Defendant exercised control over Plaintiff's terms and conditions of employment, including human resources functions,

workplace policies, supervision, and discipline, and acted as Plaintiff's employer and/or joint employer together with RATP DEV D.C. Streetcar.

11.

Defendant, Lisa Porter at all relevant times herein, served as an HR Manager at RATP. At all relevant times, Defendant Porter acted within the scope of her employment and with actual or apparent authority as Human Resources Manager, and her actions and omissions are attributable to the Employer Defendants under principles of agency and respondeat superior to the extent permitted by law.

~~Defendant, Lisa Porter, (hereinafter "Ms. Porter" or "Defendant"), at all relevant times herein,~~

~~served as an HR Manager at RATP.~~

**FACTS**

Ms. St. John is a person with a disability

12. ~~In 1986, Ms. St John was diagnosed with asthma and bronchitis, and in 2016 she was diagnosed with sleep apnea. In 2017, she was diagnosed Anxiety and Chronic Obstructive Pulmonary Disease ("COPD").~~ Ms. ST. John has long-standing respiratory disabilities, including asthma, sleep apnea, and Chronic Obstructive Pulmonary Disease ("COPD").

13. COPD is a chronic respiratory disease that causes shortness of breath, limits Ms. St. John's ability to walk extended distances, lift, climb stairs, and exert herself physically, and increases her risk of asthma exacerbations; it also affects her emotional well-being and has contributed to anxiety.~~COPD is a chronic respiratory disease that makes it difficult to breathe due to airflow limitation. It causes her shortness of breath resulting in an inability to walk significant~~

~~distances without getting out of breath or being subject to an asthma attack, which for her could be fatal. Her ability to lift over a certain amount of weight, climb stairs and run are very limited due to COPD as well.~~ ~~COPD also impacts her social and emotional well-being and has led to anxiety.~~

14. Ms. St. John's disability has affected her major life activities including, but not limited to, breathing, sleeping, walking, running, climbing stairs doing morning routines like getting dressed and bathing, ~~.~~ ~~Her ability to participate in major life activities, including daily mobility like walking or climbing stairs, and~~and completing household chores such as cleaning and shopping ~~are affected and minimized as well~~.

~~15. COPD also impacts her social and emotional well-being and has led to anxiety.~~

16. Some of the major functions of Ms. St. John's job included: driving the bus; picking up passengers to and from locations; reporting to the 17th Street site daily to pick up worksheets and daily routes; and after COVID, cleaning the bus driver's sitting area before and after her use to disinfect it.

17. Ms. St. John was ~~well~~ qualified to do her job with or without a reasonable accommodation, but her disability made ~~it difficult for her to~~ walking extended distances – particularly while carrying work supplies - difficult and medically risky. ~~that were for her long from her vehicle to the entrance of the 17th St. building worksite while pulling her bags and daily supplies.~~

18. Ms. St. John, through her doctor, requested to be able to have a designated disability parking spot in the lot close to the door of the 17th St. building, at which she reported daily.

19. This accommodation would have allowed her to be able to report timely to work and have a very short distance to walk from her vehicle to the door of the building with her belongings in hand.

20. Without a reasonable accommodation, requiring Ms. St. John to walk extended distances while carrying work-related supplies predictably caused respiratory distress, shortness of breath, and wheezing, increased her risk of asthma and COPD exacerbations, and forced her to stop, rest, or delay entry to the building to recover her breathing; additionally, because parking remained first-come, first-served, she was frequently unable to access a space upon arrival and was unable to report to work timely on a regular basis despite arriving on time. ~~Without a reasonable accommodation, requiring Ms. St. John to walk extended distances while carrying work-related supplies predictably caused respiratory distress, shortness of breath, and wheezing, increased her risk of asthma and COPD exacerbations, and forced her to stop, rest, or delay entry to the building to recover her breathing outcomes that were foreseeable given Defendants' knowledge of her documented respiratory disabilities.~~

~~21. Without an accommodation, she was unable to get to work timely on a regular basis because even when she arrived on time, she had to sit and wait for a parking space to become available as they were all on a first-come-first served basis.~~

Background

22. As stated, during the time at issue, Ms. St. John worked as a Bus Operator at RATP DEV's DC Streetcar's 17th St. location.

23. Ms. St. John was a union member, and her employment was subject to a collective bargaining agreement ("CBA").

24. Ms. St. John was ranked 5th in seniority at RAPT. (See Attachment 1, RAPT Seniority List which Ms. St. John asserts is applicable across all employee benefits.)

25. The four people ranked above her did not work the same shift that she did. This meant that if having a parking space was based on seniority within the CBA, she should have had first priority to park on the lot during her shift. Notably, Defendant never raised the CBA to Ms. St. John as being an issue with regard to her parking accommodation request.

26. The CBA mandated that RATP provide three (3) parking spaces for bargaining-unit employees that could be used on a first-come, first-served basis.

27. In addition to the three (3) designated parking spots, there are two (2) disability parking spots. (Attachment 2 - picture of lot)

28. The parking lot has limited spaces, so, nearly all employees parked on the street.

29. Prior to 2020, all Operators could park on the lot.

~~30.~~ Ms. St. John was able to find reliable parking close to the building door or on the side of the gate, which ~~.~~

~~31. This~~ was a short distance for her to walk and did not ~~cause her a shortness of breath, thereby risking~~ put her at risk of asthma attacks.

~~32. On November 13, 2023, Ms. St. John reported to her position as Bus Operator at the RATP's facility after being away for some time.~~

33. Upon her return to work on November 13, 2023, Plaintiff learned that the parking policy had changed and that bus operators were required to park outside the gate due to limited on-site spaces, requiring her to walk a distance approximately three times longer than before; as she walked into the building that day, it became apparent that this increased distance would be difficult and detrimental to her health given her respiratory disability.~~33. Upon her return she~~

~~learned that at some point in 2020, the parking policy changed; Bus Operators had to park outside of gate because there were only 5 spaces on the lot.~~

~~34. When Ms. St. John arrived to work, the spaces were all full and she had to park outside of the gate on the street which was about three times the distance she had to walk prior to the 2020 changes in parking space policy and availability.~~

~~35. November 13, 2023, as she walked into the building, she realized this distance for her to walk every day would be very difficult and detrimental to her health.~~

36. When she had a break from training that she was attending, she went to Defendant Lisa Porter, HR Manager, to request a reasonable accommodation to park in the lot in a dedicated disability space closer to the building.

37. Defendant Lisa Porter, the HR Manager, denied the request, stating that all parking spaces—including disability spaces—were first-come, first-served.~~Ms. Porter explicitly denied Ms. St. John's request telling Ms. St. John that all spaces, including the disability spaces, were first-come-first-serve.~~

38. Ms. St. John provided Ms. Porter with her disability placard and medical documentation, giving Defendants actual notice of her disability and limitations.~~Ms. St. John gave Ms. Porter additional notice of her disability by presenting Ms. Porter with her disability placard to put on file to verify that her disability was legitimate.~~

39. Ms. Porter told Plaintiff she could park along the back fence or at the rear of the building, but only on a first-come, first-served basis, which did not reduce the walking distance or mitigate Plaintiff's symptoms.

**23.** Ms. Porter assured Plaintiff she would notify management and security of this permission but failed to do so.

**24.** Plaintiff was repeatedly confronted by security and supervisors who challenged her presence in the lot, stating they had received no authorization permitting her to park there.

~~Ms. Porter then told Ms. St. John she could park in the lot all the way in the back along the back fence where everyone, (including employees with no disability), parks, but obtaining a spot was still on a first-come-first-serve basis.~~

~~40. This distance from the back of the lot to the entrance of the building was no shorter or better for Ms. St. John's condition than Ms. St. John parking outside of the lot gate and walking to the entrance.~~

~~41. Ms. St. John's daily routine included lifting out of her car and toting to the building her lunch bag and bookbag (on wheels) that contained her work cleaning supplies, water bottles and all materials she used daily while operating the Circulator bus. These items weighed about 40lbs.~~

~~42. Ms. St. John did not believe that what Ms. Porter offered was an effective accommodation, but she accepted this because she was given no better offer and had no better choice at this point.~~

~~43. She asked Ms. Porter if she was going to let management know that she [Ms. St. John] was allowed to park on the parking lot, and Ms. Porter said yes.~~

~~44. Ms. Porter told Ms. St. John she did not have to worry about anything because she [Ms. Porter] would send out a memo letting management know that Ms. St. John could park on the lot along the back fence.~~

45. On November 14, 2023, Ms. St. John was in training at the 17th St. building and she parked in the lot along the back fence.

46. She went to her vehicle on a break and there was a written notice was conspicuously posted on her vehicle stating the space was "reserved until further notice. Feel free to see management if you have any questions.... ." flyer plastered on her truck windshield, for everyone to see, telling her "…The space was reserved until further notice. Feel free to see management if you have any questions...."

47. Believing that Ms. Porter had discretely made the proper arrangements that she promised for her, Ms. St. John felt was publicly singled out and embarrassed by the sign being plastered on her vehicle for all to see and believe that she was breaking a rule.

48. November 28, 2023, while Ms. St. John was pulling into the parking lot to report to work, Security came out of the booth and told her she could not park in the lot even along the back lot fence.

49. Ms. St. John asked him to talk to Ms. Porter whom she believed had made the proper accommodation arrangements to allow Ms. St. John to park in the lot.

50. The Security Guard stated that he did not get a memo or any notification from Ms. Porter giving Ms. St. John permission to park anywhere inside the lot.

51. Ms. St. John saw a disability space in which to park, but the company vehicle, (with no disability sign in it), was already parked in the space. (Attachment 3)

52. The space in which Ms. Porter told Ms. St. John she could park along the fence in the back of the lot was taken as well.

53. Plaintiff was repeatedly forced to wait for parking to open, causing her to be late for work on multiple occasions.Ms. St. John had to wait until someone left the lot in order to get a space, which made her late for work. This scenario occurred repeatedly.

54. December 15, 2023, when Ms. St. John reported to work ~~at 6 a.m. Her space~~all spaces at the back of the fence were~~as~~ taken ~~again~~ and no disability space was available.

55. Ms. St. John was again confronted by security after parking with supervisory permission, requiring her to explain her disability and accommodation needs publicly again.

**29.** Plaintiff reported the ongoing problems and ineffectiveness of the accommodation to Ms. Porter and other managers, including the Assistant General Manager, (whom she spoke with in the lot).

**30.** Despite being informed that the accommodation was ineffective and that Plaintiff was being repeatedly confronted and harassed, management—including Ms. Porter—failed to take corrective action, allowing the situation to persist and escalate.

~~55. She asked a supervisor if she could park in a space that she saw closer to the building and the supervisor told her yes.~~

~~56. Security, however, came over confronted her telling her that she could not park there. She felt embarrassed and harassed at this unwanted confrontation.~~

~~57. At that time, she saw the Assistant General Manager, Ms. Williams, in the lot, and Ms. St. John told her about what she was going through due to her disability. She was humiliated by having to divulge her disability again and having to beg for a parking space that she was told she could have as an accommodation.~~

~~58. General Manager Williams told Security that Ms. St. John could park there for that day, and they would get it straight tomorrow.~~

~~59. Ms. St. John went back to Ms. Porter's office and informed her about the constant unwelcome daily harassment being told she could not park in the lot and not having the space available for her to park.~~

~~60. She told Ms. Porter that the accommodation of being allowed to park on the lot was in no way effective.~~

61. ~~The situation was never taken care of by any management official. Instead, the scenario of having no designated space to park and being confronted while in the lot was repeated time after time, and her dealing with management around this parking issue became more and more hostile.~~

~~62. Ms. Porter was made aware that the accommodation was not effective and still she did nothing.~~

63. On another occasion ~~day~~, ~~a~~ Supervisor ~~named~~ Butler saw Ms. St. John sitting in her car waiting for a space on the lot to become available and questioned her about her presence in the lot;~~.~~

~~64. Supervisor Butler walked over to ask Ms. St. John why she was parked in that space;~~ he told her the other Operators ~~also~~ wanted to know why she was allowed to park there, forcing Ms. St. John to repeatedly justify her disability related parking need~~in the lot~~.

~~65. Feeling singled out and harassed again because of her disability and learning that "other Operators" were now questioning her being in the lot, Ms. St. John told him that she was tired of explaining herself to everyone and told him to ask Ms. Porter.~~

66. ~~In an effort to get an effective accommodation,~~ O~~o~~n January 5, 2024, Ms. St. John again went to Ms. Porter and provided her ~~with her doctor's~~physician's note requesting disability parking to prevent shortness of breath and respiratory distress. ~~which~~ It states in ~~pertinent~~ part:

> … Ms. St. John is being seen in my pulmonary clinic for a history of severe persistent asthma and bronchiectasis. She's able to work as tolerated without restrictions. Please allow her to park her transit vehicle in disability parking as in

line with her disability paperwork to prevent instances of shortness of breath in association with ADA guidelines…. (Attachment 4)

**33.** In response, Ms. Porter again offered only first-come, first-served parking at the rear of the building, requiring Plaintiff to arrive early and wait in her vehicle for a space.

**34.** Treating first-come, first-served parking as Plaintiff's accommodation—while repeatedly subjecting her to questioning by supervisors and security, allowing coworkers to comment on her presence in the lot, and forcing her to repeatedly justify her disability-related parking need—constituted unwelcome, hostile treatment that occurred daily and became pervasive.

**35.** Plaintiff sought medical and therapeutic care due to escalating anxiety, emotional distress, and worsening respiratory symptoms caused by the lack of an effective accommodation and the resulting harassment.

**36.** Plaintiff went on medical leave from approximately January 23, 2024 through April 21, 2024.

~~67. January 13, 2024, in response to the doctor's letter and Ms. St. John again telling Ms. Porter that the accommodation was not working for her, Ms. Porter told Ms. St. John to park in the back of the building.~~

~~68. This was closer to a building door in the back but was still only available on a first-come-first-serve basis.~~

~~69. Ms. St. John continued to have to come to work earlier than scheduled and wait in her car until a space became available in the back of the lot and in the back of the building.~~

~~70. Treating first-come, first-served parking as Plaintiff's accommodation—while repeatedly subjecting her to questioning by supervisors and security, allowing coworkers to~~

comment on her presence in the lot, and forcing her to repeatedly justify her disability-related parking need constituted unwelcome, hostile treatment that occurred daily and became pervasive.

71. On or about January 15, 2024, Ms. St. John sought help from the doctor and help from a therapist due to the stress and anxiety that she was experiencing every day because of the lack of an effective accommodation and the resulting daily harassment.

72. She experienced acute anxiety and emotional distress, and her respiratory symptoms worsened as a result of the stress, anxiety, and increased physical exertion caused by the lack of parking close to the building entrance.

73. From approximately January 23, 2024 – April 21, 2024, she went on leave.

74. On or about April 22, 2024, while pulling into the parking lot at 5:50 a.m. Mr. Lewis, Safety Supervisor, watched Ms. St. John trying to find a parking space, started walkingwalked over to her truck, and questioned why she was there.

75. After Ms. St. John explained to him why she was in the lot, Mr. Lewis abruptly and aggressively confronted her told her thatsaying all the disability parking was taken and that she had to park outside of the gate.

76. She told him that she had an accommodation to park on the lot. His tone escalated as he began yelling at her insisting that she had to park outside of the lotthat she had no permission to park in the lot.

77. Mr. Lewis yelled at her rhetorically asking her how she was trying to tell him she can park in the lot when there were no disability spaces available to her.

78. Still yelling, Mr. Lewis told Ms. St. John that he didn't receive any notification permitting her to park in the lot, so she could not park in any parking space in the lot.

79. Ms. St. John told him to take it up with Ms. Porter. Ms. St. John left her car and started walking to the building.

80. Mr. Lewis followed Ms. St. john into the building, ~~still mumbling under his breath with threatening hostility and anger towards her that she could hear.~~ while continuing to berate her.

81. Ms. St. John entered the building experiencing shortness of breath and visible emotional distress following the confrontation and as a result of the ongoing harassment stemming from Defendants' refusal to implement an effective accommodation.

~~Ms. St. John went inside the building with shortness of breath and tears in her eyes from the humiliation, hurt, fear, and frustration due to all of the harassment that she had experienced to date as a result of Ms. Porter harassing her by refusing to provide her with an effective accommodation.~~

~~82. Ms. St. John was in despair and was tired of the daily "fight" just to get into the building to go do her work.~~

~~83. Defendants' behavior was most unwelcomed, hostile, and pervasive, causing her extreme embarrassment, humiliation, anxiety, frustration, and stress.~~

84. The same day of the confrontation with Mr. Lewis, Ms. St. John spoke to Ms. Hedgepath, Operations Manager, about her encounter with Mr. Lewis, and Ms. Hedgepath told Ms. St. John to write up the incident, which Ms. St. John did.

85. Ms. Porter dismissed the complaint, declined to investigate, and took no remedial action.~~Ms. St. John sent the written complaint to Ms. Porter and Ms. Porter's response was Mr. Lewis didn't do anything.~~

~~86. Ms. St. John told her to pull the camera footage in the lot and she could see his behavior.~~

87. In May 2024, as the harassment continued, Ms. St. John continued to complain to Ms. Porter about the lack of an effective accommodation, the repeated confrontations, and the failure to notify security and management.~~again went to complain to Ms. Porter about not having the proper people notified that she could park in the lot, about being harassed about parking, about not being effectively accommodated, and about how she felt discriminated against because of her disability.~~

88. ~~Because Ms. St. John complained to Ms. Porter so many times about not being effectively accommodated and because she continued to plead for help,~~ T~~t~~his time when Ms. St. John came to complain and ask for help,~~ from~~ Ms. Porter, Ms. Porter hid behind her office door from Ms. St. John;~~.~~ she refused to engage in the interactive process or address the harassment.

~~89. When Ms. St. John saw her hiding, Ms. Porter acted like she was playing.~~

~~90. Ms. St. John told her, "I am trying to get an effective accommodation for my health, I am stressed and sensitive about my health, and you are hiding from me?!"~~

~~91. This added to the hostile work environment created by Employer Defendants' Management intentionally refusing to effectively accommodate Ms. St. John and intentionally failing to address her complaints of harassment.~~

~~92. Ms. Porter never notified management or security of the permission that she gave Ms. St. John to park in the lot. She also ignored Ms. St. John's complaints of harassment.~~

93. As a result of Defendants' failure to provide an effective accommodation, Plaintiff was subjected to repeated questioning, confrontations, and yelling by management regarding her presence in the parking lot, conduct that could have been avoided through a designated disability

parking accommodation and that became severe, pervasive, and unchecked.93. Ms. St. John was subjected to constant questioning, fussing and yelling from management when she was in the parking lot.

94. Ms. St. John contends that this harassment towards her from management could have been avoided with an effective accommodation, which could have included, but not have been limited to, a parking permit for a truly designated disability spot.

95. Ms. St. John was the victim of a failure to effectively accommodate her reasonable request, and that failure created a hostile work environment that was severe, pervasive and went unchecked by Management.

96. Ms. St. John required ongoing therapy and medical treatment due to anxiety, emotional distress, and worsening respiratory symptoms.

**46.** Plaintiff's medications were adjusted, her respiratory symptoms worsened, and she lost pay and benefits due to missed work caused by Defendants' unlawful conduct.

Ms. St. John had to see and continues to see a therapist as a result of the harassment she received at the hands of management at RATP from January 13, 2024 through April 2025. (The harassment occurred over 12 months during this 15-month time period as Ms. St. John took leave from January 23, 2024 - April 22, 2024.)

97. Her doctor submitted a request for disability parking that was ignored by RATP.

98. Her medication has changed; her inhalers got larger because of her wheezing and shortness of breath caused by additional walking, toting her belongings, and exertion she had to expend as a result of RATP's failure to effectively accommodate her with a dedicated parking space. She lost pay and benefits for days that she had to miss work due to anxiety and health concerns that arose from not being effectively accommodated.

## CLAIM I
## Failure to Accommodate in violation of Title I of the ADA, as amended
## 42 U.S.C. §§12111-12117

99. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

100. Ms. St. John has a documented disability, including, but not limited to asthma, bronchiectasis, and COPD, that severely affects her respiratory system.

101. Defendant had notice of her disability when she requested a reasonable accommodation, provided a disability parking placard, and submitted her doctor's reasonable accommodation request to be able to park in the disability parking spot in the parking lot of the building at which she reports to work.

102. Defendant's response, through Ms. Porter, was that she [Ms. Porter] could not accommodate Ms. St. John because the parking was on a first-come-first-serve basis.

103. After Ms. St. John presented Ms. Porter with her handicap placard, Ms. Porter told her she could park along the back fence of the parking lot and/or in the back of the building on a first-come-first-serve basis.

104. Neither of these options included parking in the designated disability parking space that Ms. St. John and her doctor requested as a reasonable accommodation.

105. Ms. Porter did not notify anyone that Ms. St. John had permission to park in the parking lot at all.

106. Instead, Defendant allowed employees with lesser priority than Ms. St. John and employees with work vehicles with no disability placards to park in the disability parking. Ms. St. John was also subjected to the same first-come-first-serve parking policy that all employees without accommodations were subjected to, which in effect rendered Ms. St. John with no effective accommodation at all.

107. If a CBA was a concern, as a union employee, Ms. St. John had seniority on her shift to park in the disability parking.

108. She ranked 5 in seniority at RATP, and on her shift she had first priority because the employees with seniority over her did not work on her shift.

109. An accommodation was available; Defendant could have provided Ms. St. john with a parking permit to park in a designated disability space in the parking lot during her shift.

110. She also could have been given a parking permit to park in another designated spot if, for some reason, the disability parking was not available, which she contends it was, during her shift.

111. Also to implement an effective accommodation, Defendant could have notified relevant people, including management and parking security, that Ms. St. John had permission to park in the lot.

112. Providing Ms. St. John with a designated parking spot would not have been a hardship for the Defendants in any way.

113. Given the numerous times Plaintiff reported that the accommodation was ineffective, Defendant intended to not provide the requested accommodation or any alternative effective accommodation, and Defendant intentionally refused to engage in a good-faith interactive process to explore possible solutions.

114. Having Ms. St. John find parking daily on a first-come-first-serve basis in competition with other employees who had no disability(ies) was not an effective accommodation.

115. Defendant intentionally refused to engage in a meaningful interactive process, to the point of Ms. Porter intentionally hiding from Ms. St. John when she was coming to inform Ms. Porter that the accommodation remained ineffective.

116. Ms. St. John continues to suffer physically, mentally and emotionally because she was not properly accommodated.

117. She had to have her inhalers and medication changed as a result of the stress and excess physical exertions she had to undergo daily because of not being properly accommodated with a dedicated space.

118. She also missed days from work due to the anxiety and health issues that occurred as a result of not being effectively accommodated.

119. Defendant is therefore liable to Plaintiff for all damages proximately resulting from the distress she has suffered related to the conduct of Defendant.

120. As a result of Defendant's refusal to provide an effective accommodation, Ms. St. John experienced foreseeable respiratory distress, exacerbation of her asthma and COPD, and repeated delays or inability to report to work timely despite arriving on time.

120. Due to Defendant's actions, Plaintiff suffered of inconvenience, emotional distress, mental anguish, embarrassment, and humiliation.

121. She was made to endure a great amount pain and suffering and such impact is ongoing and permanent in nature.

# CLAIM II

**Retaliation**
**In Violation of Title I of the ADA**
**42 U.S.C. § 12203**
(Against Employer Defendants Only)

122. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

123. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation, submitting medical documentation, complaining repeatedly about ineffective accommodation, and reporting disability-based harassment.

124. Employer Defendants had actual knowledge of Plaintiff's protected activity.

125. Following Plaintiff's protected activity, Employer Defendants subjected Plaintiff to materially adverse actions, including refusing to provide an effective accommodation, escalating confrontations and repeated challenges to Plaintiff's right to park pursuant to her accommodation, permitting repeated harassment by management and security, ignoring formal complaints, and creating conditions that would dissuade a reasonable employee from engaging in protected activity.

126. Employer Defendants' retaliatory actions were not isolated or accidental but escalated after Plaintiff's repeated complaints and medical submissions.

127. After Plaintiff complained and submitted medical documentation, Employer Defendants continued and escalated their responses through repeated confrontations and public humiliation, including the posted notice on her vehicle and aggressive challenges by supervisors and security.

128. There is a causal connection between Plaintiff's protected activity and Employer Defendants' adverse actions.

129. Employer Defendants' conduct violated the ADA's anti-retaliation provisions.

# CLAIM III

**Hostile Work Environment Based on Disability**
**In Violation of Title I of the ADA**
(Against Employer Defendants Only)

130. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

131. Plaintiff is a qualified individual with a disability within the meaning of the ADA.

132. Plaintiff was subjected to unwelcome harassment because of her disability and her accommodation requests.

133. The harassment was severe and pervasive in that it, occurred repeatedly over an extended period, involved aggressive and repeated confrontations by supervisors and securityy employees, and included public humiliation, publicly singled Plaintiff out, aggressive confrontations, and management-sanctioned interferednce with Plaintiff's access to her workplace, and foreseeably caused physical respiratory distress and emotional harm..

134. Defendants' practice of treating first-come, first-served parking as Plaintiff's accommodation—while repeatedly subjecting Plaintiff to questioning by supervisors and security, allowing coworkers to comment on her presence in the parking lot, and forcing Plaintiff to repeatedly justify her disability-related parking need—constituted unwelcome and hostile conduct that occurred on a near-daily basis, was severe and pervasive, and interfered with Plaintiff's ability to access her workplace and perform her job on equal terms with non-disabled employees.

135. Such conduct interfered with Plaintiff's ability to access her workplace and perform her job on equal terms with non-disabled employees.

136. Employer Defendants knew or should have known of the harassment and failed to take prompt and effective remedial action.

137. Employer Defendants' conduct altered the conditions of Plaintiff's employment and created an abusive and hostile working environment.

138. Defendants are liable under the ADA for disability-based hostile work environment.

# CLAIM IV

**Disability Discrimination and Failure to Provide Reasonable Accommodation**
**In Violation of the District of Columbia Human Rights Act**
**D.C. Code § 2-1402.11(a)**
(Against All Defendants)

139. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

140. Plaintiff is a person with a disability within the meaning of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(5A), including but not limited to asthma, bronchiectasis, COPD, sleep apnea, and anxiety, which substantially limit major life activities including breathing, walking, sleeping, lifting, and working.

141. At all relevant times, RATP and/or Midtown were employers within the meaning of the DCHRA.

142. Defendants had actual knowledge of Plaintiff's disability and resulting limitations through Plaintiff's repeated disclosures, submission of a disability parking placard, and submission of a physician's written accommodation request.

143. Plaintiff requested a reasonable accommodation in the form of permission to park in a designated disability parking space near the workplace entrance in order to safely access her job site.

144. The requested accommodation was reasonable, available, and would not have imposed an undue hardship on Defendants.

145. Despite notice, Employer Defendants failed and refused to provide Plaintiff with an effective accommodation and instead subjected Plaintiff to the same first-come-first-serve parking policy as non-disabled employees, rendering the purported accommodation ineffective.

146. Employer Defendants further failed to engage in a good-faith interactive process to identify or implement a reasonable accommodation, despite Plaintiff's repeated reports that the accommodation was not working and was endangering her health.

147. Defendants' refusal to provide an effective accommodation denied Plaintiff equal access to her workplace and materially altered the terms and conditions of her employment, including delays in reporting to work, lost wages, and medical harm caused by respiratory exacerbations..

148. Defendants' conduct constituted unlawful disability discrimination and failure to accommodate in violation of the DCHRA.

149. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered physical injury, emotional distress, lost wages and benefits, medical expenses, and other compensable damages.

# CLAIM V

**Retaliation**
**In Violation of the District of Columbia Human Rights Act**
**D.C. Code § 2-1402.61**
(Against All Defendants)

150. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

151. Plaintiff engaged in protected activity under the DCHRA by requesting reasonable accommodation, submitting medical documentation, complaining repeatedly about ineffective accommodation, and reporting disability-based harassment by management and security personnel.

152. Defendants were aware of Plaintiff's protected activity.

153. Following Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse actions, including but not limited to: refusing to implement or communicate an effective accommodation; repeatedly allowing security and supervisors to confront Plaintiff in the parking lot and challenge her right to park; publicly singling Plaintiff out by posting a notice on Plaintiff's vehicle implying she was improperly parked; requiring plaintiff to repeatedly explain and justify her disability related parking request to multiple managers and security personnel; ignoring Plaintiff's written complaint regarding hostile and aggressive treatment; and otherwise permitting the harassment to continue unchecked - conduct that would deter a reasonable employee from requesting accommodation or complaining about discrimination.

154. Defendants' adverse actions were causally connected to Plaintiff's protected activity and were undertaken in retaliation for Plaintiff's complaints and accommodation requests.

155. Defendants' retaliatory conduct was intentional, willful, and in reckless disregard of Plaintiff's rights under the DCHRA.

156. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered lost wages, emotional distress, physical harm, and other damages.

# CLAIM VI

**Hostile Work Environment Based on Disability**
**In Violation of the District of Columbia Human Rights Act**
(Against All Defendants)

157. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

158. Plaintiff was subjected to repeated, unwelcome conduct by Defendants because of her disability and her requests for accommodation.

159. The harassment included, among other things: repeated confrontations by security and supervisors; being publicly accused of improper parking; a written notice placed conspicuously on her vehicle; being followed into the building while being yelled at; being required to repeatedly disclose her disability to justify her presence; and management's refusal to intervene or correct the conduct.

160. After Plaintiff complained and submitted medical documentation, Defendants' responses escalated from denial to repeated confrontations and public humiliation, including the posted notice on her vehicle and aggressive challenges by supervisors and security.

~~160. .~~

~~161.~~ **160.** The harassment was severe and pervasive, occurred over many months, involved multiple supervisory employees, publicly humiliated Plaintiff, interfered with her ability to access the workplace and report to work timely, and was physically harmful given Plaintiff's known respiratory condition.~~The harassment was severe and pervasive, occurred over many months, involved multiple supervisory employees, and was humiliating, intimidating, and physically harmful given Plaintiff's known respiratory condition.~~

~~162.~~161. Defendants knew or should have known of the harassment and failed to take prompt and effective remedial action.

~~163.~~162. Defendants' conduct created a hostile, abusive, and intimidating work environment that altered the conditions of Plaintiff's employment and interfered with her ability to perform her job safely.

~~164.~~163. As a direct and proximate result of Defendants' conduct, Plaintiff suffered substantial emotional, physical, and economic harm.

# CLAIM VII

**Aiding and Abetting Discrimination and Retaliation**
**D.C. Code § 2-1402.62**
(Against Defendant Lisa Porter)

~~165.~~164. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

~~166.~~165. Defendant Lisa Porter knowingly aided, abetted, incited, compelled, and coerced the unlawful discriminatory and retaliatory conduct described herein.

~~167.~~166. Ms. Porter personally denied Plaintiff's accommodation requests, failed to communicate approved accommodations, ignored written complaints, refused to engage in the interactive process, and actively avoided Plaintiff when further complaints were made.

~~168.~~167. Ms. Porter's conduct was intentional and materially contributed to the discrimination, retaliation, and hostile work environment suffered by Plaintiff.

~~169.~~168. Ms. Porter is individually liable under the DCHRA for aiding and abetting unlawful employment practices.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants The Midtown Group/RATP DEV D.C. Streetcar and Lisa Porter, jointly and severally, and prays that this Honorable Court:

a. Award equitable relief for all harm Plaintiff has sustained as a result of Defendants' unlawful conduct, including for loss of promotional potential, reputation, lost wages, and lost job benefits;

b. Award compensatory damages;

c. Punitive damages under the District of Columbia Human Rights Act against Defendants, including Defendant Lisa Porter where applicable;

d. Award medical costs and expenses incurred as a result of Defendants' unlawful conduct;

e. Award-lost wages; back pay benefits with interest;

f. Award reasonable attorneys fees, cost, and expenses incurred for this action;

g. Award equitable relief, declaratory, and injunctive relief;

h. An award of prejudgment and post judgment interest as permitted by law; and

i. Award such other and further relief as this Honorable Court deems just and proper.

January 14, 2026

Respectfully Submitted,

By:/s/ Sandra A. Maddox

SANDRA A. MADDOX
20 F. St. NW, Ste. 700
Washington, D.C. 20001
Phone No.: 202-412-4787
sandra.maddox@themaddoxlawoffice.com
*Counsel for Plaintiff*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **TONYA ST. JOHN** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **The Midtown Group/** | **)** | |
| **RATP DEV D.C.** | **)** | Civil Action No. **2025-CAB-007879** |
| **And** | **)** | |
| **Lisa Porter, HR Manager** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |
| ______________________________ | **)** | |

*[proposed]* **ORDER**

Upon consideration of Plaintiff's Motion for Leave to File Second Amended Complaint, and for good cause shown, it is hereby:

**ORDERED** that Plaintiff's Motion is **GRANTED**.

SO ORDERED.

_______________________________________________
Judge _____________________________________________ Date: _____________

Superior Court of the District of Columbia

Copies to:
Sandra Maddox, Esq
Sandra.maddox@themaddoxlawoffice.com
*Counsel for Plaintiff*

Mathew Clark
mclark@constangy.com
*Counsel for Defendants*