# EXHIBIT F

Attachment 1

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TONYA ST. JOHN** | ) |
| **138 Ivanhoe St., SW** | ) |
| **Apt. 201** | ) |
| **Washington, D.C. 20032** | ) |
| **(202) 569-1444** | ) |
| | ) |
| | ) |
| **Complainant,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2025-CAB-007879** |
| | ) |
| **The Midtown Group/** | ) |
| **RATP DEV D.C.** | ) |
| **And** | ) |
| **Lisa Porter, HR Manager** | ) |
| | ) |
| | ) |
| **Debra Martinez,** | ) |
| **Registered Agent** | ) |
| **3800 Sandshell Drive** | ) |
| **Suite 180** | ) |
| **Fort Worth, Texas 76137** | ) |
| | ) |
| **And** | ) |
| | ) |
| **300 Throckmorton Street** | ) |
| **Suite 670** | ) |
| **Fort Worth, TX 76102** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| ______________________________ | ) |

**SECOND AMENDED COMPLAINT**

**COMES NOW** Plaintiff, Tonya St. John, (hereinafter "Ms. St. John" or "Plaintiff"), and files this complaint against The Midtown Group/RATP DEV D.C. Streetcar (hereinafter "RATP",

"Defendant" or "Employer Defendant") and Lisa Porter, (hereinafter "Defendant" or "Ms. Porter"), Human Resources ("HR") Manager and as for causes of action states as follows:

**NATURE OF CASE**

1. This is an employment discrimination action arising from Defendants' failure to provide a reasonable accommodation to a qualified employee with a documented respiratory disability, and from retaliation and harassment following Plaintiff's protected activity. Plaintiff brings claims under Title I of the Americans with Disabilities Act ("ADA") and the District of Columbia Human Rights Act ("DCHRA").

2. Plaintiff alleges that Defendant RATP DEV D.C. Streetcar/The Midtown Group, acting as Plaintiff's employer, refused to provide or implement an effective accommodation despite medical documentation, failed to engage in a good-faith interactive process, and subjected Plaintiff to escalating adverse treatment, including repeated confrontations and public humiliation, that interfered with Plaintiff's access to her workplace.

3. Plaintiff further alleges that Defendants' conduct created a hostile work environment based on disability and caused physical injury, emotional distress, lost wages, and other damages.

4. Plaintiff's ADA claims are asserted against the employer Defendant(s) only. Plaintiff's DCHRA claims are asserted against all Defendants, including Defendant Lisa Porter.

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction under D.C. Code § 11-921 and has jurisdiction over Plaintiff's claims under the ADA, 42 U.S.C. §§ 12111–12117, and the D.C. Human Rights Act, D.C. Code § 2-1402.11.

6. Plaintiff timely exhausted her administrative remedies under Title I of the ADA by filing an EEOC Charge on or about October 30, 2024.

7. The EEOC issued a Determination and Notice of Rights on or about September 3, 2025, and Plaintiff filed this action on December 1, 2025, within ninety (90) days of her receipt of that Notice.

8. Venue is appropriate because all of the unlawful actions complained of herein took place within the District of Columbia.

**PARTIES**

9. Plaintiff, Tonya St. John, is an individual who is and has been a resident of the District of Columbia, and she formerly worked as a Bus Operator at the Midtown Group/RATP DEV's D.C. Streetcar's 17th Street location.

10. Defendant RATP is a transportation business with over 50 years of experience managing and operating transit systems throughout the United States. During the time at issue, Defendant operated within Washington, D.C., and at all relevant times, Defendant exercised control over Plaintiff's terms and conditions of employment, including human resources functions, workplace policies, supervision, and discipline, and acted as Plaintiff's employer and/or joint employer together with RATP DEV D.C. Streetcar.

11. Defendant, Lisa Porter at all relevant times herein, served as an HR Manager at RATP. At all relevant times, Defendant Porter acted within the scope of her employment and with actual or apparent authority as Human Resources Manager, and her actions and omissions are attributable to the Employer Defendants under principles of agency and respondeat superior to the extent permitted by law.

## FACTS

Ms. St. John is a person with a disability

12. Ms. St. John has long-standing respiratory disabilities, including asthma, sleep apnea, and Chronic Obstructive Pulmonary Disease ("COPD").

13. COPD is a term for certain types of irreversible lung and airway damage that block a person's airways and make it hard to breathe.

14. Ms. St. John's disability has affected her major life activities including, but not limited to, breathing, sleeping, walking, running, climbing stairs doing morning routines like getting dressed and bathing, and completing household chores such as cleaning and shopping; it also affects her emotional well-being and has contributed to anxiety.

15. Some of the major functions of Ms. St. John's job included: driving the bus; picking up passengers to and from locations; reporting to the 17th Street site daily to pick up worksheets and daily routes; and after COVID, cleaning the bus driver's sitting area before and after her use to disinfect it.

16. Ms. St. John was qualified to do her job with or without a reasonable accommodation, but her disability made walking extended distances – particularly while carrying work supplies - difficult and medically risky.

17. Ms. St. John, through her doctor, requested to be able to have a designated disability parking spot in the lot close to the door of the 17th St. building, at which she reported daily.

18. This accommodation would have allowed her to be able to report timely to work and have a very short distance to walk from her vehicle to the door of the building with her belongings in hand.

19. Without a reasonable accommodation, requiring Ms. St. John to walk extended distances while carrying work-related supplies predictably caused respiratory distress, shortness of breath, and wheezing, increased her risk of asthma and COPD exacerbations, and forced her to stop, rest, or delay entry to the building to recover her breathing; additionally, because parking remained first-come, first-served, she was frequently unable to access a space upon arrival and was unable to report to work timely on a regular basis despite arriving on time.

Background

20. As stated, during the time at issue, Ms. St. John worked as a Bus Operator at RATP DEV's DC Streetcar's 17th St. location.

21. Ms. St. John was a union member, and her employment was subject to a collective bargaining agreement ("CBA").

22. Ms. St. John was ranked 5th in seniority at RAPT. (See Attachment 1, RAPT Seniority List which Ms. St. John asserts is applicable across all employee benefits.)

23. The four people ranked above her did not work the same shift that she did. This meant that if having a parking space was based on seniority within the CBA, she should have had first priority to park on the lot during her shift. (Notably, Defendant never raised the CBA to Ms. St. John as being an issue with regard to her parking accommodation request until her complaint at the EEOC).

24. The CBA mandated that RATP provide three (3) parking spaces for bargaining-unit employees that could be used on a first-come, first-served basis.

25. In addition to the three (3) designated parking spots, there are two (2) disability parking spots. (Attachment 2 - picture of lot)

26. The parking lot has limited spaces, so, nearly all employees parked on the street.

27. Prior to 2020, all Operators could park on the lot. Ms. St. John was able to find reliable parking close to the building door or on the side of the gate, which was a short distance for her to walk and did not put her at risk of asthma attacks.

28. Upon her return to work on November 13, 2023, Plaintiff learned that the parking policy had changed and that bus operators were required to park outside the gate due to limited on-site spaces, requiring her to walk a distance approximately three times longer than before; as she walked into the building that day, it became apparent that this increased distance would be difficult and detrimental to her health given her respiratory disability.

29. When she had a break from training that she was attending, she went to Defendant Lisa Porter, HR Manager, to request a reasonable accommodation to park in the lot in a dedicated disability space closer to the building.

30. Defendant Lisa Porter, the HR Manager, denied the request, stating that all parking spaces—including disability spaces—were first-come, first-served.

31. Ms. St. John provided Ms. Porter with her disability placard, giving Defendants actual notice of her disability and limitations.

32. Ms. Porter told Plaintiff she could park along the back fence, but only on a first-come, first-served basis, which did not reduce the walking distance or mitigate Plaintiff's symptoms.

33. Ms. Porter assured Ms. St. John she would notify management and security of this permission but failed to do so.

34. Subsequently, when Ms. St. John tried to implement the ineffective accommodation, she was repeatedly confronted by security and supervisors who challenged her presence in the lot, stating they had received no authorization permitting her to park there.

35. On November 14, 2023, Ms. St. John was in training at the 17th St. building and she parked in the lot along the back fence.

36. She went to her vehicle on a break and a written notice was conspicuously posted on her vehicle stating the space was "reserved until further notice. Feel free to see management if you have any questions...."

37. Believing that Ms. Porter had discretely made the proper arrangements that she promised for her, Ms. St. John was publicly singled out and embarrassed by the sign being plastered on her vehicle for all to see and believe that she was breaking a rule.

38. November 28, 2023, while Ms. St. John was pulling into the parking lot to report to work, Security came out of the booth and told her she could not park in the lot even along the back lot fence.

39. Ms. St. John asked him to talk to Ms. Porter whom she believed had made the proper accommodation arrangements to allow Ms. St. John to park in the lot.

40. The Security Guard stated that he did not get a memo or any notification from Ms. Porter giving Ms. St. John permission to park anywhere inside the lot.

41. Ms. St. John saw a disability space in which to park, but the company vehicle, (with no disability sign in it), was already parked in the space. (Attachment 3)

42. The space in which Ms. Porter told Ms. St. John she could park along the fence in the back of the lot was taken as well.

43. Plaintiff was repeatedly forced to wait for a parking space to become available, causing her to be late for work on multiple occasions.

44. December 15, 2023, when Ms. St. John reported to work all spaces at the back of the fence were taken and no disability space was available.

45. Ms. St. John was again confronted by security after parking with supervisory permission, requiring her to explain her disability and accommodation needs publicly again.

46. Plaintiff reported the ongoing problems and ineffectiveness of the accommodation to Ms. Porter and other managers, including the Assistant General Manager, (who gave her the permission to park in the lot on December 15, 2023).

47. Despite being informed that the accommodation was ineffective and that Plaintiff was being repeatedly confronted and harassed, management—including Ms. Porter—failed to take corrective action, allowing the situation to persist and escalate.

48. On another occasion, Supervisor Butler saw Ms. St. John sitting in her car waiting for a space on the lot to become available and questioned her about her presence in the lot; he told her the other Operators wanted to know why she was allowed to park there, forcing Ms. St. John to repeatedly justify her disability related parking need.

49. On January 5, 2024, Ms. St. John again went to Ms. Porter and provided her physician's note requesting disability parking to prevent shortness of breath and respiratory distress. It states in part:

> … Ms. St. John is being seen in my pulmonary clinic for a history of severe persistent asthma and bronchiectasis. She's able to work as tolerated without restrictions. Please allow her to park her transit vehicle in disability parking as in line with her disability paperwork to prevent instances of shortness of breath in association with ADA guidelines…. (Attachment 4)

50. In response, Ms. Porter again offered only first-come, first-served parking at the rear of the building, requiring Plaintiff to arrive early and wait in her vehicle for a space.

51. Treating first-come, first-served parking as Plaintiff's accommodation—while repeatedly subjecting her to questioning by supervisors and security, allowing coworkers to comment on her presence in the lot, and forcing her to repeatedly justify her disability-related parking need—constituted unwelcome, hostile treatment that occurred daily and became pervasive.

52. Plaintiff sought medical and therapeutic care due to escalating anxiety, emotional distress, and worsening respiratory symptoms caused by the lack of an effective accommodation and the resulting harassment.

53. Plaintiff went on leave from approximately January 23, 2024 through April 21, 2024.

54. On or about April 22, 2024, while pulling into the parking lot at 5:50 a.m. Mr. Lewis, Safety Supervisor, watched Ms. St. John trying to find a parking space, walked over to her truck, and questioned why she was there.

55. After Ms. St. John explained to him why she was in the lot, Mr. Lewis abruptly and aggressively confronted her saying all the disability parking was taken and that she had to park outside of the gate.

56. She told him that she had an accommodation to park on the lot. His tone escalated as he began yelling at her insisting that she had no permission to park in the lot.

57. Still yelling, Mr. Lewis told Ms. St. John that he didn't receive any notification permitting her to park in the lot, so she could not park in any parking space in the lot.

58. Ms. St. John told him to take it up with Ms. Porter, and she got out of her car and started walking to the building.

59. Mr. Lewis followed Ms. St. john into the building while continuing to berate her.

60. Ms. St. John entered the building experiencing shortness of breath and visible emotional distress following the confrontation and as a result of the ongoing harassment stemming from Defendants' refusal to implement an effective accommodation.

61. The same day of the confrontation with Mr. Lewis, Ms. St. John spoke to Ms. Hedgepath, Operations Manager, about her encounter with Mr. Lewis, and Ms. Hedgepath told Ms. St. John to write up the incident, which Ms. St. John did.

62. Ms. Porter dismissed the complaint, declined to investigate, and took no remedial action despite Ms. St. John asking her to look at the video footage that would have been recorded by security cameras.

63. In May 2024, as the harassment continued, Ms. St. John continued to complain to Ms. Porter about the lack of an effective accommodation, the repeated confrontations, and the failure to notify security and management.

64. This time when Ms. St. John came to complain and ask for help, Ms. Porter hid behind her office door from Ms. St. John; she refused to engage in the interactive process or address the harassment.

65. As a result of Defendants' failure to provide an effective accommodation, Plaintiff was subjected to repeated questioning, confrontations, and yelling by management regarding her presence in the parking lot, conduct that could have been avoided through a designated disability parking accommodation and that became severe, pervasive, and unchecked.

66. Ms. St. John required ongoing therapy and medical treatment due to anxiety, emotional distress, and worsening respiratory symptoms.

67. Plaintiff's medications were adjusted, her respiratory symptoms worsened, and she lost pay and benefits due to missed work caused by Defendants' unlawful conduct.

**CLAIM I**
**Failure to Accommodate in violation of Title I of the ADA, as amended**
**42 U.S.C. §§12111-12117**

68. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

69. Ms. St. John has a documented disability, including, but not limited to asthma, bronchiectasis, and COPD that severely affects her respiratory system.

70. Employer Defendant had notice of her disability when she requested a reasonable accommodation, provided a disability parking placard, and submitted her doctor's reasonable accommodation request to be able to park in the disability parking spot in the parking lot of the building at which she reports to work.

71. Employer Defendant, through Ms. Porter, denied Plaintiff's request, stating that all parking—including disability spaces—was first-come, first-served.

72. Ms. Porter offered Plaintiff the ability to park along the back fence or behind the building on a first-come, first-served basis, neither of which provided access to a designated disability parking space or meaningfully reduced the walking distance required, rendering the purported accommodation ineffective.

73. Employer Defendant failed to communicate any accommodation to management or security, resulting in repeated challenges to Plaintiff's ability to park, also rendering the purported accommodation ineffective.

74. Employer Defendant continued to allow non-disabled employees and company vehicles without disability placards to occupy disability parking spaces during Plaintiff's shift.

75. Reasonable accommodations were available, including assigning Plaintiff a designated disability parking space or issuing a parking permit and notifying management and security, none of which would have imposed an undue hardship.

76. Despite Plaintiff's repeated reports that the accommodation was ineffective and medically harmful, Employer Defendant refused to modify the accommodation or engage in a good-faith interactive process.

77. Treating first-come, first-served parking as Plaintiff's accommodation did not enable her to access the workplace safely or timely and thereby perform the essential functions of her job, and it did not constitute a reasonable accommodation under the ADA.

78. As a result of Employer Defendant's failure to effectively accommodate, Plaintiff experienced foreseeable respiratory distress, exacerbation of her asthma and COPD, and repeated delays or inability to report to work timely despite arriving on time.

79. Employer Defendant's refusal to provide an effective accommodation and failure to engage in the interactive process violated Title I of the ADA.

80. Plaintiff suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages as a direct and proximate result of Employer Defendant's unlawful conduct.

**CLAIM II**
**Retaliation**
**In Violation of Title I of the ADA**
**42 U.S.C. § 12203**
(Against Employer Defendants Only)

81. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

82. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation, submitting medical documentation, complaining repeatedly about ineffective accommodation, and reporting disability-based harassment.

83. Employer Defendants had actual knowledge of Plaintiff's protected activity.

84. Following Plaintiff's protected activity, Employer Defendants subjected Plaintiff to materially adverse actions, including refusing to provide an effective accommodation, escalating confrontations and repeated challenges to Plaintiff's right to park pursuant to her accommodation, permitting repeated harassment by management and security, ignoring and/or not effectively addressing formal complaints, and creating conditions that would dissuade a reasonable employee from engaging in protected activity.

85. Employer Defendants' retaliatory actions were not isolated or accidental but escalated after Plaintiff's repeated complaints and medical submissions.

86. After Plaintiff complained and submitted medical documentation, Employer Defendants continued and escalated their responses through repeated confrontations and public humiliation, including the posted notice on her vehicle and aggressive challenges by supervisors and security, conduct that would deter a reasonable employee from requesting accommodation or complaining about discrimination.

87. There is a causal connection between Plaintiff's protected activity and Employer Defendants' adverse actions.

88. Employer Defendants' conduct violated the ADA's anti-retaliation provisions.

## CLAIM III
## Hostile Work Environment Based on Disability
## In Violation of Title I of the ADA
(Against Employer Defendants Only)

89. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

90. Plaintiff is a qualified individual with a disability within the meaning of the ADA.

91. Plaintiff was subjected to unwelcome conduct in the workplace that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

92. The harassment was severe and pervasive in that it included repeated and aggressive confrontations by supervisors and security, public singling out and humiliation, interference with Plaintiff's access to the workplace, and the requirement that Plaintiff repeatedly justify her disability-related parking need, conduct that occurred on a near-daily basis and foreseeably caused physical respiratory distress and emotional harm.

93. The hostile conduct was disability-based because it arose directly from Employer Defendants' knowledge of Plaintiff's disability, their denial of her requested accommodation, and their failure to implement or communicate any effective accommodation, which foreseeably exposed Plaintiff to repeated confrontation, scrutiny, and humiliation in accessing her workplace.

94. Employer Defendants knew or should have known of the disability-based harassment because Plaintiff repeatedly reported the conduct to Human Resources and management, submitted a written complaint following a confrontational incident involving a supervisor, requested review of available camera footage, and the harassment was carried out openly and repeatedly by supervisors and security personnel in employer-controlled spaces; despite this knowledge, Employer Defendants failed to take prompt or effective remedial action.

95. Because of Employer Defendants' failure to intervene, correct the conduct, or implement an effective accommodation Plaintiff's work conditions were materially altered, and she was subjected to a hostile and abusive work environment that interfered with her ability to perform her job on equal terms with non-disabled employees.

96. As a result of Employer Defendants' actions and omissions, Plaintiff was subjected to an abusive and hostile working environment in violation of the ADA.

**CLAIM IV**
**Disability Discrimination and Failure to Provide Reasonable Accommodation In Violation of the District of Columbia Human Rights Act D.C. Code § 2-1402.11(a)**
(Against All Defendants)

97. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

98. Plaintiff is a person with a disability within the meaning of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02(5A), including but not limited to asthma, bronchiectasis, COPD, sleep apnea, and anxiety, which substantially limit major life activities including breathing, walking, sleeping, lifting, and working.

99. At all relevant times, RATP was an employer within the meaning of the DCHRA.

100. Defendants had actual knowledge of Plaintiff's disability and resulting limitations through Plaintiff's repeated disclosures, submission of a disability parking placard, and submission of a physician's written accommodation request.

101. Plaintiff requested a reasonable accommodation in the form of permission to park in a designated disability parking space near the workplace entrance in order to safely access her job site.

102. The requested accommodation was reasonable, available, and would not have imposed an undue hardship on Defendants.

103. Despite notice, Defendants failed and refused to provide Plaintiff with an effective accommodation and instead subjected Plaintiff to the same first-come, first-served parking policy as non-disabled employees, rendering the purported accommodation ineffective.

104. Defendants further failed to engage in a good-faith interactive process to identify or implement a reasonable accommodation, despite Plaintiff's repeated reports that the accommodation was not working and was endangering her health.

105. Defendants' refusal to provide an effective accommodation denied Plaintiff equal access to her workplace and materially altered the terms and conditions of her employment, including delays in reporting to work, lost wages, and medical harm caused by respiratory exacerbations.

106. Defendants' conduct constituted unlawful disability discrimination and failure to accommodate in violation of the DCHRA.

107. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered physical injury, emotional distress, lost wages and benefits, medical expenses, and other compensable damages.

**CLAIM V**
**Retaliation**
**In Violation of the District of Columbia Human Rights Act**
**D.C. Code § 2-1402.61**
(Against All Defendants)

108. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

109. Plaintiff engaged in protected activity under the DCHRA by requesting reasonable accommodation, submitting medical documentation, complaining repeatedly about ineffective accommodation, and reporting disability-based harassment by management and security personnel.

110. Defendants were aware of Plaintiff's protected activity.

111. Because of Plaintiff's protected activity, and in response to her requests for accommodation and complaints of disability-based harassment, Defendants subjected Plaintiff to materially adverse actions, including but not limited to: refusing to implement or communicate an effective accommodation; repeatedly permitting security and supervisors to confront Plaintiff in the parking lot and challenge her right to park; publicly singling Plaintiff out by posting a notice on her vehicle implying she was improperly parked; requiring Plaintiff to repeatedly explain and justify her disability-related parking request to multiple managers and security personnel; ignoring Plaintiff's written complaint regarding hostile and aggressive treatment; and otherwise allowing the harassment to continue unchecked—conduct that would deter a reasonable employee from requesting accommodation or complaining about discrimination.

112. Defendants' adverse actions were causally connected to Plaintiff's protected activity and were undertaken in retaliation for Plaintiff's complaints and accommodation requests.

113. Defendants' retaliatory conduct was intentional, willful, and in reckless disregard of Plaintiff's rights under the DCHRA.

114. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered lost wages, emotional distress, physical harm, and other damages.

**CLAIM VI**
**Hostile Work Environment Based on Disability**
**In Violation of the District of Columbia Human Rights Act**
(Against All Defendants)

115. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

116. Plaintiff was subjected to repeated, unwelcome conduct by Defendants because of her disability and her requests for accommodation.

117. The harassment included, among other things: repeated confrontations by security and supervisors; being publicly accused of improper parking; a written notice placed conspicuously on her vehicle; being followed into the building while being yelled at; being required to repeatedly disclose her disability to justify her presence; and management's refusal to intervene or correct the conduct.

118. After Plaintiff complained and submitted medical documentation, Defendants' responses escalated from denial to repeated confrontations and public humiliation, including the posted notice on her vehicle and aggressive challenges by supervisors and security.

119. Although individual supervisors and security personnel may not have known the specific medical diagnosis underlying Plaintiff's accommodation request, the hostile work environment Plaintiff experienced was disability-based because Employer Defendants knew Plaintiff had a disability, denied her requested accommodation despite knowing she needed it because of her disability, failed to communicate or implement any effective accommodation, and thereby created conditions that predictably caused supervisors and security to repeatedly confront, single out, and publicly humiliate Plaintiff.

120. The resulting harassment was not incidental or independent conduct but flowed directly from Employer Defendants' refusal to authorize or communicate a disability-related accommodation, despite knowledge that such failure would foreseeably expose Plaintiff to repeated confrontation, scrutiny, and humiliation in the workplace.

121. The harassment was severe and pervasive, occurred over many months, involved multiple supervisory employees, and was humiliating, intimidating, and physically harmful given Plaintiff's known respiratory condition.

122. Defendants knew or should have known of the harassment and failed to take prompt and effective remedial action.

123. As a result of Defendants' conduct, Plaintiff was subjected to a hostile, abusive, and intimidating work environment that altered the conditions of her employment and interfered with her ability to perform her job safely and on equal terms with non-disabled employees.

124. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered substantial emotional distress, physical injury, lost wages, and other compensable damages.

**CLAIM VII**
**Aiding and Abetting Discrimination and Retaliation**
**D.C. Code § 2-1402.62**
(Against Defendant Lisa Porter)

125. Plaintiff restates the allegations set forth in the preceding paragraphs as if they were fully stated herein.

126. Defendant Lisa Porter knowingly aided, abetted, incited, compelled, and coerced the unlawful discriminatory and retaliatory conduct described herein.

127. Ms. Porter personally denied Plaintiff's accommodation requests, failed to communicate approved accommodations, ignored written complaints, refused to engage in the interactive process, and actively avoided Plaintiff when further complaints were made.

128. Ms. Porter's conduct was intentional and materially contributed to the discrimination, retaliation, and hostile work environment suffered by Plaintiff.

129. Ms. Porter is individually liable under the DCHRA for aiding and abetting unlawful employment practices.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants The Midtown Group/RATP DEV D.C. Streetcar and Lisa Porter, jointly and severally, and prays that this Honorable Court:

a. Award equitable relief for all harm Plaintiff has sustained as a result of Defendants' unlawful conduct, including for loss of promotional potential, reputation, lost wages, and lost job benefits;

b. Award compensatory damages;

c. Punitive damages under the District of Columbia Human Rights Act against Defendants, including Defendant Lisa Porter where applicable;

d. Award medical costs and expenses incurred as a result of Defendants' unlawful conduct;

e. Award-lost wages and back pay with interest;

f. Award reasonable attorneys fees, cost, and expenses incurred for this action;

g. Award equitable relief, declaratory, and injunctive relief;

h. An award of prejudgment and post judgment interest as permitted by law; and

i. Award such other and further relief as this Honorable Court deems just and proper.

January 15, 2026

Respectfully Submitted,

By:/s/ Sandra A. Maddox

SANDRA A. MADDOX
20 F. St. NW, Ste. 700
Washington, D.C. 20001
Phone No.: 202-412-4787
sandra.maddox@themaddoxlawoffice.com
*Counsel for Plaintiff*